UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br>United States Department of Justice<br>Antitrust Division<br>1401 H Street, N.W. Suite 8000<br>Washington, DC  20530<br><br>                    Plaintiff,<br><br>          v.<br><br>**QUALCOMM INCORPORATED,**<br>5775 Morehouse Drive<br>San Diego, CA  92121<br><br>and<br><br>**FLARION TECHNOLOGIES, INC.,**<br>Bedminster One<br>135 Route 202/206 South<br>Bedminster, NJ  07921<br><br>                    Defendants. | Civil Action No.<br>Judge:<br>Date: |

**COMPLAINT FOR CIVIL PENALTIES FOR VIOLATION OF PREMERGER
REPORTING REQUIREMENTS OF THE HART-SCOTT-RODINO ACT**

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to obtain civil penalties against QUALCOMM Incorporated ("QUALCOMM") and Flarion Technologies, Inc. ("Flarion").

**I.  NATURE OF THE ACTION**

1.      The United States of America brings this action for violations of Section 7A of the Clayton Act, as amended, 15 U.S.C. § 18a, also commonly known as the Hart-Scott-Rodino

Antitrust Improvements Act of 1976 ("Section 7A" or the "HSR Act"). Section 7A is intended to give federal antitrust agencies an opportunity to investigate certain mergers and to seek judicial intervention, if necessary, to prevent acquisitions that violate the antitrust laws. When Section 7A applies, it requires parties to file premerger notifications with the Department of Justice and the Federal Trade Commission. Section 7A requires that the merging parties observe a designated waiting period before the acquiring person may hold, directly or indirectly, the voting securities or assets of the acquired person. Section 7A thus prohibits such acquisitions prior to the expiration of the waiting period. The aim is to preserve the acquired firm as an independent company in case the proposed acquisition is blocked or otherwise not consummated so that the competition that the antitrust laws protect does not suffer. Any person who fails to comply with any provision of the HSR Act is liable to the United States for a maximum civil penalty of $11,000 for each day during which that person is in violation. 15 U.S.C. § 18a(g)(l); *amended by* Pub. L. No. 101-410, § 4, 104 Stat. 890 (1990); *amended by* Pub. L. No. 104-134, § 31001(s), 110 Stat. 1321-373 (1996); and FTC Rule 1.98(a), 16 C.F.R. § 1.98(a) (2000).

  2. The notification and waiting period requirements of Section 7A apply to direct or indirect acquisitions that meet the HSR Act's thresholds. At all times relevant to this Complaint, the HSR Act's reporting and waiting period requirements applied to some transactions that would have resulted in the acquiring person holding more than $53.1 million, and all transactions where the acquiring persons would hold more than $212.3 million of the acquired person's voting securities and/or assets except for certain exempted transactions.

  3. Section 801.1(c)(1) of the Premerger Notification Rules, 16 C.F.R. § 800 *et seq.* (the "HSR Rules"), defines "hold" to mean to have "beneficial ownership." The Statement of

Basis and Purpose that accompanied the issuance of Section 801.1(c)(1), 43 Fed. Reg. 33450, 33458 (July 31, 1978), states that "the existence of beneficial ownership is determined in the context of the particular case with reference to the person or persons that enjoy the indicia of beneficial ownership."

    4.    On July 25, 2005, the defendants entered into an Agreement and Plan of Reorganization (the "Merger Agreement"), pursuant to which QUALCOMM would acquire Flarion. Because it was valued well in excess of Section 7A's $212.3 million "size of transaction" threshold and did not qualify for any of the Act's exemptions, this merger was subject to the premerger notification and waiting period requirements of the Act. The applicable waiting period, which was extended by the issuance of requests for additional information on September 19, 2005, expired on December 23, 2005. QUALCOMM completed its acquisition of Flarion on January 18, 2006.

    5.    The Merger Agreement contained provisions that prevented Flarion from engaging in certain basic business activities during the Section 7A waiting period without QUALCOMM's written consent. Under the Merger Agreement, Flarion could not, without QUALCOMM's consent: enter into agreements to license its intellectual property to third parties; enter into agreements involving the obligation to pay or receive $75,000 or more in a year or $200,000 or more in the aggregate; enter into agreements relating to the disposition or acquisition of intellectual property rights, except for "shrinkwrap" software licenses with purchase prices of less than $10,000; or present business proposals to customers or prospective customers. Although the Merger Agreement permitted Flarion to support certain pre-existing deployments of its technology, it prohibited Flarion from either expanding the scope of those

Case 1:06-cv-00672-PLF    Document 1    Filed 04/13/2006    Page 4 of 13

deployments or committing to deliver any new equipment in support of those deployments after December 31, 2005.

6. From July 25, 2005, when the defendants entered into the Merger Agreement, and continuing throughout the Section 7A waiting period, Flarion ceded to QUALCOMM control of much of its management and operations, including customer proposals, price discounts, licensing strategies, and personnel decisions. Within days after the defendants agreed to merge, Flarion began seeking QUALCOMM's consent before entering transactions with third parties. In many instances, Flarion deferred to QUALCOMM on business decisions even when the Merger Agreement did not purport to oblige Flarion to do so. A senior executive at Flarion summed up Flarion's approach as follows: "Bascially [*sic*] before we sign any new contracts we seek Q consent." A senior executive at QUALCOMM noted that Flarion was "being very careful seeking our approval on even very small operational level agreements."

7. QUALCOMM effectively acquired Flarion's business before the expiration of the Section 7A waiting period through the Merger Agreement's requirements that Flarion obtain QUALCOMM's consent before undertaking numerous competitive activities and through the parties' conduct, by which Flarion did not make even routine business decisions unless and until QUALCOMM consented. By obtaining operational control of Flarion's business, QUALCOMM acquired beneficial ownership of Flarion's assets and thus acquired and held those assets within the meaning of Section 7A prior to the expiration of the Section 7A waiting period. Section 7A prohibits such "gun jumping." Through the totality of their conduct, QUALCOMM and Flarion each violated Section 7A and should be ordered to pay appropriate civil penalties as provided by the HSR Act.

-4-

## II. JURISDICTION AND VENUE

8.  This complaint is filed under 15 U.S.C. § 18a(g)(1). This Court has jurisdiction over this action and the defendants under 15 U.S.C. § 18a(g), and 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355(a).

9.  Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b)-(c) and 1395(a) because the defendants during all relevant time periods transacted business and were found here.

## III. THE DEFENDANTS

10. QUALCOMM is incorporated under the laws of Delaware, with its principal place of business in San Diego, California. QUALCOMM is the leading developer of Code Division Multiple Access (CDMA) technology for wireless networks. QUALCOMM Technology Licensing, a division of QUALCOMM, earns royalties from the licensing of its CDMA patent portfolio. Another division, QUALCOMM CDMA Technologies, designs and supplies integrated circuits and system software (chipsets) found in CDMA devices and networks. QUALCOMM's technology is essential to both CDMA2000 and WCDMA, key standardized technologies now being deployed for third-generation (3G) mobile wireless networks, as well as improved versions of these services, CDMA-EV-DO Rev. A (Evolution Data Optimized) and CDMA-based HSPDA (high-speed downlink packet access), which are expected to be commercially available this year. QUALCOMM has also acquired Orthogonal Frequency Division Multiplex (OFDM) patents and created an OFDM-based product, the MediaFlo wireless television delivery network.

11.     At all times relevant to this Complaint, Flarion was incorporated under the laws of Delaware, with its principal place of business in Bedminster, New Jersey.  Flarion was launched in 2000 with investments from Lucent Technologies, Inc. and venture capitalists.  Flarion was a pioneer and leading developer of OFDM and Orthogonal Frequency Division Multiple Access (OFDMA) technology and has approximately 120 issued patents and pending patent applications.  Flarion developed FLASH-OFDM, an implementation of OFDMA optimized for mobile broadband wireless Internet protocol (IP) networks.  FLASH-OFDM currently is in trials and limited commercial deployment in the United States and overseas.  Flarion licensed intellectual property and sold products used in connection with its mobile wireless broadband system.

12.     At all times relevant to this Complaint, both QUALCOMM and Flarion marketed their competing technologies to entities which operate or supply mobile wireless networks in the United States, including the District of Columbia, and areas abroad, including India and Brazil.

13.     On January 18, 2006, QUALCOMM completed its acquisition of Flarion, and Flarion became a wholly-owned subsidiary of QUALCOMM.

14.     At all times relevant to this Complaint, both QUALCOMM and Flarion were engaged in commerce or activity affecting commerce within the meaning of Section 1 of the Clayton Act, 15 U.S.C. § 12, and Section 7A(a)(1) of the Clayton Act, 15 U.S.C. § 18a(a)(1).

### IV. DEFENDANTS' MERGER AGREEMENT

15.     Pursuant to the Merger Agreement QUALCOMM and Flarion agreed that QUALCOMM would acquire Flarion for approximately $600 million in QUALCOMM stock and cash.  In addition, upon the satisfaction of certain conditions over the next few years, QUALCOMM would pay an additional $205 million in cash and stock.

16. The Merger Agreement restricted Flarion's discretion to conduct its affairs during the period between the signing of the Agreement and the closing of the transaction, a period that included the full duration of the applicable waiting period required by Section 7A of the Clayton Act. Relevant portions of Section 5.1 of the Merger Agreement are referenced below.

17. In Section 5.1 of the Merger Agreement, Flarion agreed that "[d]uring the period from the date of this Agreement and continuing until . . . the Effective Time of [the] Merger," Flarion would "carry on its business . . . in the ordinary course in substantially the same manner as heretofore conducted," except that Flarion would not "do, cause or permit" various actions described in twenty-one subsequent paragraphs, lettered (a) through (u), without QUALCOMM's written consent.

18. Section 5.1(e) of the Merger Agreement required that Flarion obtain QUALCOMM's written consent before entering into any agreement to license its intellectual property to a third party.

19. Section 5.1(h) of the Merger Agreement required that Flarion obtain QUALCOMM's written consent before entering into (a) any agreement involving the obligation to pay, or right to receive, $75,000 or more per year or $200,000 or more in the aggregate, except purchase orders issued by Flarion to suppliers under obligations pre-dating the Merger Agreement; (b) agreements relating to the disposition or acquisition of intellectual property rights, except for "shrinkwrap" software licenses with purchase prices of less than $10,000; or (c) any "material contract." In mid-October 2005, the defendants amended subpart (a) to apply only to obligations to pay money and raised the dollar thresholds to $250,000 per year and $1,000,000 in the aggregate.

20. Section 5.1(m) of the Merger Agreement required that Flarion obtain QUALCOMM's written consent before it could "hire any employee ... except in the ordinary course of business in accordance with its standard past practice."

21. Section 5.1(s) of the Merger Agreement required that Flarion obtain QUALCOMM's written consent before presenting business proposals to any customer or prospective customer. In mid-October 2005, the defendants amended this section to allow Flarion to present proposals "in the ordinary course of business in accordance with its standard past practice."

22. Section 5.1(x) of the Merger Agreement provided that, notwithstanding the foregoing provisions, Flarion was permitted to sell products under the existing terms of contracts already in effect between Flarion and original equipment manufacturers, and to support the deployment of Flarion technology in specified countries but only to a limited extent as provided in an attached schedule.

23. QUALCOMM insisted on the provisions in Section 5.1 because it did not intend to commercialize Flarion's FLASH-OFDM product in its current form and did not want Flarion to enter into agreements that were inconsistent with QUALCOMM's future plans for the Flarion technology.

## V. DEFENDANTS' CONDUCT FOLLOWING THE MERGER AGREEMENT

24. QUALCOMM's control over Flarion involved business decisions well beyond even what the Merger Agreement purported to require. For example, Section 5.1(m) of the Merger Agreement allowed Flarion to hire new employees "in the ordinary course of business in

accordance with its standard past practice." However, as a QUALCOMM executive testified at his deposition, "most of the requests were [for] pretty routine things" such as "[h]iring people."

25.     On multiple occasions Flarion sought QUALCOMM's review and consent before it marketed products and services to customers and potential customers. These occasions included the submission of entire drafts of customer proposals for QUALCOMM's review, requests for approval of price quotations, and a request to offer a discount to an existing customer. As a result of QUALCOMM's influence and control, Flarion was discouraged from pursuing smaller accounts that were of little interest to QUALCOMM, created a policy on providing price information to mirror QUALCOMM's policy, and did not pursue a customer proposal that would have met Flarion's margin targets.

26.     On one occasion prior to the expiration of the waiting period, Flarion sought QUALCOMM's consent to discount products to be sold to a Malaysian customer. In evaluating the request, QUALCOMM considered the gross margins Flarion reported it would make on the product sales at the discounted price, expressed skepticism that Flarion could achieve those margins, and requested back-up to support the gross margin claims from Flarion. QUALCOMM believed gross margins of 30-40% were acceptable while Flarion believed gross margins of 25-30% were acceptable. QUALCOMM denied Flarion's request for consent to offer the discount.

27.     Even when QUALCOMM did not explicitly withhold consent for Flarion to undertake certain activities, it discouraged Flarion from business opportunities it might otherwise have pursued, such as small technology deployments of a kind that Flarion previously had sought. In one instance, Flarion requested a meeting between its sales force and QUALCOMM's sales

force to "review target opportunities and account status." QUALCOMM's response gave clear direction:

> As I have indicated in our previous discussions we want to be very careful about how we pursue these small opportunities so that we don't get distracted from pursuing larger opportunities that can drive scale and efforts to further develop the technology to meet those demands.

Later, when a prospective customer approached Flarion about a public safety network opportunity, Flarion told the customer that the opportunity "is not likely to get approval since Q does not want to take on support for small deployments." Moreover, a senior executive for QUALCOMM testified at his deposition that he recalled providing Flarion guidance "related to ... size and scale and not being ... distracted with smaller commercial opportunities."

28. In reviewing Flarion's customer proposals, QUALCOMM exercised its approval authority over Flarion to further QUALCOMM's own business interests and its post-merger business plans for the Flarion assets. For example, Flarion sought consent to enter a contract with an Indian company that would serve as Flarion's local agent for a trial Flash-OFDM deployment. A senior QUALCOMM executive discussed Flarion's request with QUALCOMM's Indian business development team. He later testified that when he sought input from QUALCOMM's business development team in India it was to determine whether Flarion's proposals "would fit with [QUALCOMM's] plans in India." Later, QUALCOMM sent representatives to Flarion's prospective customer in India to discuss a solution using QUALCOMM's EV-DO technology in place of Flarion's Flash-OFDM.

29. On another occasion prior to the expiration of the waiting period, Flarion sought QUALCOMM's consent to provide pricing information to a potential customer in Brazil. After

consulting its Brazilian business development team, QUALCOMM allowed Flarion to provide only a portion of the pricing that Flarion had sought to provide and instructed Flarion not to disclose its ASIC chip pricing. Flarion then created a pricing policy precluding the disclosure of ASIC chip pricing to operators, which a Flarion executive testified at his deposition had not existed previously. A QUALCOMM executive explained at his deposition that QUALCOMM did not want Flarion to disclose its ASIC chip pricing because it was QUALCOMM's practice not to provide such prices. The executive stated that it was "not in [QUALCOMM's] interest to tell operators pricing that then can be shared back to OEMs and used in pricing negotiations and various other things."

## VI. **VIOLATION OF SECTION 7A OF THE CLAYTON ACT**

30.  The merger between QUALCOMM and Flarion was subject to Section 7A's premerger notification and waiting period requirements.

31.  Pursuant to the Merger Agreement and through the conduct described above, QUALCOMM substituted its business interests and judgment for those of Flarion and exercised operational control over Flarion's business before the expiration of the waiting period required by Section 7A.

32.  By controlling Flarion's business operations while having agreed to acquire Flarion, QUALCOMM acquired beneficial ownership of Flarion's assets and thus acquired and held those assets within the meaning of Section 7A on or about July 25, 2005.

33.  QUALCOMM and Flarion were continuously in violation of Section 7A from on or about July 25, 2005, through the expiration of the statutory waiting period on December 23, 2005.

Each defendant is liable to the United States for a maximum civil penalty of $11,000 per day that the defendant was in violation of Section 7A.

## VI.  REQUEST FOR RELIEF

WHEREFORE, the United States of America prays that final judgment be entered against each defendant declaring, ordering, and adjudging:

    a.    that QUALCOMM acquired Flarion in violation of the HSR Act and that QUALCOMM and Flarion were in violation of the HSR Act from on or about July 25, 2005 through the expiration of the statutory waiting period on December 23, 2005;

    b.    that each defendant pay to the United States an appropriate civil penalty as provided under Section 7A(g)(1) of the Clayton Act, 15 U.S.C. § 18a(g)(1), and 16 C.F.R. § 1.98(a);

    c.    that the Court grant such other relief as the United States may request that the Court deems just and proper; and

    d.    that the United States recover its costs in this action.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____/s/_____
THOMAS O. BARNETT
Assistant Attorney General

_____/s/_____
J. BRUCE McDONALD
Deputy Assistant Attorney General

_____/s/_____
DOROTHY B. FOUNTAIN
Deputy Director of Operations

_____/s/_____
NANCY M. GOODMAN
(D.C. Bar # 251694)
Chief, Telecommunications & Media
    Enforcement Section

_____/s/_____
LAURY E. BOBBISH
Assistant Chief, Telecommunications &
    Media Enforcement Section

_____/s/_____
CLAUDE F. SCOTT, JR. (D.C. Bar # 414906)

HILLARY B. BURCHUK (D.C. Bar # 366755)
JARED A. HUGHES
ROBERT P. MAHNKE
MARY F. WALTERS (D.C. Bar # 461891)

Trial Attorneys
U.S. Department of Justice
Antitrust Division
Telecommunications & Media
    Enforcement Section
1401 H Street, N.W., Suite 8000
Washington, DC  20530
Telephone: (202) 514-5621
Facsimile: (202) 514-6381